**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DONGFANG SHAO | ) |
| 9421 Canonbury Place | ) |
| Arlington, VA 22031 | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. |
| CARLA HAYDEN, in her capacity as | ) |
| LIBRARIAN of CONGRESS | ) Jury Trial Demanded |
| 101 Independence Avenue, S.E. | ) |
| Washington, DC 20540 | ) |
| Defendant. | ) |

_____

# COMPLAINT AND JURY DEMAND

Plaintiff, Dongfang Shao, by and through his undersigned counsel, brings this Complaint because the Library of Congress ["Library"], through its management personnel, discriminated against him by depriving him of his proper performance evaluation and by various acts of offensive and objectionable conduct which constituted harassment which aggregated together, as they must be, created and maintained a hostile work environment which persists, on the basis of Plaintiff's national origin [China] and his race [Asian] and seeks appropriate and equitable remedies to compensate him for the consequences of these unlawful and adverse acts and to ensure such discriminatory animus which now is pervasive and permeates the Asian Division of the Library ceases.

I.  **JURISDICTION AND VENUE**

1

1. At all times relevant to this Complaint, Plaintiff has been a full-time employee of the Library of Congress.

2. Defendant, Carla Hayden, is the Librarian of Congress, the head of the Library of Congress, which is an agency of the United States Government. This civil action is brought against her in her official capacity.

3. This civil action is brought pursuant to the Congressional Accountability Act ("CAA"), 2 U.S.C §1302 (a)(2), which adopts Title VII of the Civil Rights Act of 1964, as amended, specifically, 42 U.S.C §2000e *et seq.*( prohibiting discrimination on the basis of national origin and race, among other bases).

4. This Court has jurisdiction pursuant to 28 U.S.C. §1331[Federal Question], and 42 U.S.C. §2000e-(f), §2000e-16.

5. Venue for this Civil Action is appropriate in the United States District Court for the District of Columbia pursuant to 28 U.S.C.§1391, and 2 U.S.C. § 1408, because all of the unlawful employment actions at issue in this civil action occurred in the District of Columbia, Plaintiff is employed with Defendant within this judicial district,  and the Library of Congress is within this judicial district.

6. Plaintiff has fulfilled all conditions precedent under Title VII of the Civil Rights Act of 1964 prior to commencing this civil action, as necessary, and otherwise exhausted his administrative remedies.

7. This civil action is filed within the 70-day period after Plaintiff filed his initial claim with the Office of Congressional Workplace Rights on June 24, 2020.

## II.    FACTS

2

8. Plaintiff Dongfang Shao was born in China and is a male citizen of the United States.

9. Plaintiff has been employed by the Library of Congress continuously since April of 2012, as Chief of the Asian Division, a Senior Level (SL) Executive, having come to the Library of Congress after serving at the Stanford University Libraries as Director for its East Asia Library from 2003 until he became employed by the Library of Congress.

10. The Asian Division of the Library of Congress consists of 21 employees, 16 of whom are Asian American (15) or African American (1). All of the Asian American staff members in the Division are first generation immigrants and have made great contributions towards expanding and managing the Asian collections at the Library of Congress, a main purpose for the Library's recruitment of Plaintiff to become a Senior Level employee and Chief of the Asian Division of the Library of Congress.

11. The Asian Division collections at the Library of Congress, which are now estimated to amount to more than 4 million physical items in more than 190 languages and dialects.

12. Plaintiff's supervisor is Eugene Flanagan, the Director of General and International Collections Directorate (GICD), Library of Congress.

13. Mr. Flanagan supervises chiefs of seven (7) divisions, including the Asian, African and Middle Eastern, European, Hispanic, Research and Reference Services, Science and Business, and Serial and Government Documents Divisions, and first four (4) divisions are international collections, which manage most of non-English materials in the Library.

14. The non-English language collections at the Library account for about half of the Library's entire collection.

15. Mr. Flanagan is not Asian or a person of Asian descent.

16. GICD was established in October 2018 as one of two directorates created out of the former Collections and Services Directorate.

17. Mr. Flanagan was appointed as GICD's inaugural director on October 1, 2018.

18. An open search, which is the typical process the Library utilizes when it seeks to fill a director level position, was not conducted or publicly announced by the Library for the GICD Directorship.

19. Prior to Mr. Flanagan's current position, he was a director in National and International Outreach (NIO) in the Library, until NIO was disbanded in 2018. Before the NIO position, he was a director of Business Enterprises in the Library. Prior to that, Mr. Flanagan was a Library contractor with KPMG.

**FACTS RELATED TO THE UNLAWFUL DISCRIMINATION PLAINTIFF HAS EXPERIENCED AS A LIBRARY EMPLOYEE FOR WHOM EUGENE FLANAGAN IS HIS ASSIGNED SUPERVISOR**

20. During the nearly two years since Eugene Flanagan was named to the directorship, GICD staff across multiple divisions, in particular the Asian Division and Plaintiff, its Chief, have experienced a persistent and continuing pattern of racial and national origin discrimination, offensive and objectionable comments and conduct, directed aggressions, and microaggressions carried out and imposed by Mr. Flanagan.

21. The specific incidents involving Mr. Flanagan's racially discriminatory actions and practices which have served to create and maintain a hostile work environment based on national origin (China) and race (Asian) are set forth in detail below.

22. The Library is aware of the allegations Plaintiff presents in this Complaint but has failed to take any, much less the appropriate and necessary, action to rectify either the

discriminatory performance evaluations Mr. Flanagan issued with regard to Plaintiff or the ongoing discriminatory work environment Plaintiff and his colleagues are obligated to work in as Library employees under Mr. Flanagan's directorate.

23. More specifically, Mr. Flanagan purposefully discredited Plaintiff's contributions and achievements within the Asian Division of the Library of Congress, which had been recognized and frequently lauded over the past seven and a half (7.5) years prior to Mr. Flanagan's unorthodox appointment to the Directorate.

**The unfair and unsubstantiated performance rating as Plaintiff's 2019 annual and 2020 mid-year performance appraisals Mr. Flanagan issued manifested national origin and racial discrimination against Plaintiff as an Asian American manager.**

24. Specifically, Mr. Flanagan gave Plaintiff (and the Asian Division's collective performance) a "Successful" rating for 2019 in October 2019.

25. Mr. Flanagan did not provide any specific details or feedback to support the "Successful" rating he gave, nor did he note any negative and constructive comments on my performance.

26. Moreover, at no point during the entire rating period, did Flanagan ever provide any guidance or feedback to Plaintiff about his (Asian Division's) performance, even though Flanagan had set bi-weekly, one-on-one meetings with Plaintiff ostensibly for that purpose.

27. Even during the mid-year (six-month) progress review with Plaintiff held in April of 2019, Mr. Flanagan similarly did not provide any recommendations or guidance on Plaintiff's performance nor did he note any negative or constructive comments n

Plaintiff's performance or any comment to suggest that Plaintiff was not on track to reach a rating of at least "Commendable."

28. After Plaintiff received this "Successful" rating on October 31, 2019, he immediately requested Mr. Flanagan to reconsider the rating.

29. Plaintiff also responded on November 4, 2019, through the Library's Workforce Performance Management Library of Congress to report Mr. Flanagan's unwarranted and unfair rating.

30. Among the grounds for the requested reconsideration of the rating issued by Mr. Flanagan Plaintiff noted the following: The rating is, first of all, inconsistent with the achievements of Plaintiff and the Asian Division in 2019, and secondly,  quite disparate and much reduced from the ratings he had received in the past six (6) years while employed by the Library.

31. As Chief of the Asian Division, Plaintiff's SL performance goals are intimately tied with the Asian Division's Annual Performance Goals ["APGs"].

32. In 2019 the Asian Division exceeded all APGs set in Plaintiff's SL evaluation form. The Asian Division 2019 annual report details all the Division's accomplishments as well as execution of routine responsibilities, projects, and programs.

33. Since Plaintiff joined the Library in 2012, he had received five (5) "Outstanding" ratings and one (1) "Commendable" rating- the latter a result of the Library's directive that ratings should, generally, be reduced.

34. A "Successful" rating would suggest Plaintiff's performance in 2019 did not reach the same level as in prior years, but Plaintiff was not made aware of any major changes to the performance rating standards.

35. Plaintiff has been in the same Senior Level position since he arrived in the Library of

   Congress in 2012 and received the following ratings for his annual performance rating:

   2013: "Outstanding" (rated by Jeremy Adamson, Director, Collections and Services
   Directorate);
   2014: "Outstanding" (rated by Jeremy Adamson, Director, Collections and Services
   Directorate);
   2015: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services
   Directorate);
   2016: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services
   Directorate);
   2017: "Outstanding" (rated by Helena Zinkham, Director, Collections and Services
   Directorate);
   2018: "Commendable" (rated by Helena Zinkham, Director, Collections and Services
   Directorate);
   2019: "Successful" (rated by Eugene Flanagan, Director, General and International
   Collections Directorate).

36. Thereafter, on January 13, 2020, Plaintiff received an email entitled "Senior Level

   Executive Performance and Recognition Results for the 2019 and 2018 performance

   Appraisal Cycles", sent by Joe Cappello, acting Chief Human Capital Officer.

37. In this email Mr. Cappello noted, "For the 2019 performance cycle, 54 percent of

   executives received a rating of Outstanding, 41 percentage received a rating of

   Commendable, and 5 percent received a rating of Successful."

38. Only upon receipt of Mr. Cappello's email three months after Mr. Flanagan issued

   Plaintiff his reduced rating, was he made aware that "Successful" was the lowest rating

   given to only five (5%) percent of SLs. Out of about 80 SLs in the Library, this meant

   that only four (4) SLs receiving the "Successful" rating.

39. In sharp contrast to the rating Mr. Flanagan issued to Plaintiff, an Asian American, for

   that same rating period other international collection divisions with otherwise similarly-

   situated White Chiefs including Mr. Flanagan who served as acting chief of African and

Middle Eastern Division (AMED), received "Commendable" or higher ratings, even though a comparison of the respective annual reports for these divisions demonstrates that Plaintiff and the Asian Division performed equally or better than such other divisions, including the European Division.

40. This marked disparity in the assessments issued by Mr. Flanagan lacks any non-discriminatory basis.

41. This clear disparity in the ratings issued by Mr. Flanagan for 2019 reveals that a pattern of unlawful discrimination exists within the Directorate under Mr. Flanagan as demonstrated by the comparison of Mr. Flanagan's assessment of Plaintiff with his assessment of the other chiefs of international collection divisions who are not Persons of Color such as Plaintiff's peer chiefs in the AMED, European and Hispanic Divisions.

42. Further, the Asian Division exceeded its Annual Performance Goals ["APGs"], and in some areas more than doubled those standard goals in 2019 over the prior year.

43. The "Successful" rating for 2019 that Flanagan issued to Plaintiff has not only resulted in damage to the reputation of Plaintiff and the Asian Division as a whole, but also produced a direct and negative economic impact on Plaintiff.

44. Despite various documented work achievements and his leadership of the Asian Division through its steady and substantial growth including (but not limited to) five "Outstanding" ratings and recognition of his successful implementation of various Office of Inspector General ["OIG"] recommendations as set forth in its audit report on the Asian Division, after being named his immediate supervisor Mr. Flanagan chose to downgrade Plaintiff's rating to "Successful," which foreseeably resulted in Plaintiff

receiving the lowest award in the Library's 2019 SL performance incentive, announced on January 18, 2020, despite his exemplary work as the Chief of Asian Division.

45. The assertions in the foregoing 20 paragraphs are the pertinent facts in the Library's official records that should have been relied upon by Mr. Flanagan to evaluate and rate Plaintiff's performance.

46. More specifically, when the 2019 SL awards were announced on January 18, 2020, individuals outside of Plaintiff's protected classifications received higher awards (54% of SLs received $9,000-$10,000, 41% of SLs received $6,000, 5% of SLs including Plaintiff received $3,000). This public information concretely manifests the adverse economic impact Flanagan's unsubstantiated and discriminatory assessment has had on Plaintiff.

47. Following the announcement of the SL awards, on February 3, 2020, Grant Harris, Chief of European Division, told Plaintiff that he had received a "Commendable" rating from Mr. Flanagan for his 2019 annual performance appraisal.

48. Mr. Harris also stated that compared with Plaintiff's accomplishments and the Asian Division's achievements in 2019, his own performance was no better than Plaintiff's because he felt Plaintiff, as a custodian division chief, had accomplished more than he had in that year.

49. A comparison of the annual reports of the Asian Division and the European Division would result in an objective person concluding that the achievements of the Asian Division which Plaintiff led in 2019 exceeded those of the European Division which Mr. Harris lead.

50. However, because Mr. Harris is not a Person-of-Color, Mr. Flanagan gave him a "Commendable" rating which was a higher rating than the one he assigned to Plaintiff and one which could not be supported by the Library's official documents.

51. Mr. Flanagan also gave Susan Schadl, who is Chief of the Hispanic Division and is not a Person-of-Color, a "Commendable" rating for that same rating period.

52. A reasonable person aware of the above facts would recognize that the glaring and otherwise inexplicable disparity appears to arise from the discriminatory animus toward Asians and Asian-Americans that motivates Mr. Flanagan when charged with making employment-related decisions.

53. Plaintiff challenged Mr. Flanagan's markedly reduced performance appraisal as unfair and unsubstantiated, but Mr. Flanagan was never able to pinpoint any "real" mistakes in Plaintiff's work and had not identified any deficiencies nor had he written down any negative comments with regard to Plaintiff's performance.

54. But Mr. Flanagan insisted that Plaintiff whose evaluation was based on the Asian Division's accomplishments, should be given a lower "Successful" rating than he gave to Plaintiff's fellow Chiefs of international collection divisions who are White.

55. Mr. Flanagan did not change the rating despite Plaintiff's request that he do so.

56. There is no non-discriminatory reason why the similarly-situated international collection divisions' chiefs who are White were treated more favorably in terms of Mr. Flanagan's rating and performance award in 2019.

57. For the reasons set forth in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

58. Defendant's actions were motivated by malice and reckless disregard for Plaintiff's rights under law.

59. As a result of Defendant's actions, Plaintiff suffered, and will continue to suffer, economic damages in lost income and reduced retirement benefits, and non-economic damages, emotional damages in pain and suffering, embarrassment, humiliation, feelings of depression and anxiety and diminished self-esteem and confidence.

**FIRST COUNT: NATIONAL ORIGIN AND/OR RACE DISCRIMINATION**

60. Plaintiff repeats and realleges all of the above paragraphs as if they were specifically restated here.

61. The Library of Congress, through its supervisory employee Eugene Flanagan issued an unwarranted and unsubstantiated performance appraisal to Plaintiff for 2019 because of his national origin and/or his race.

62. As a result of the discriminatory performance appraisal Plaintiff suffered, and will continue to suffer, economic damages in lost income and reduced retirement benefits, and non-economic damages, emotional damages in pain and suffering, embarrassment, humiliation, feelings of depression and anxiety and diminished self-esteem and confidence.

**Other Actions by Mr. Flanagan Which Manifested Discriminatory Animus Towards Plaintiff, an Asian American and United States Citizen who was born in China**

63. Mr. Flanagan flagrantly ignored the Library's rules and Federal laws with respect to a Notice of Proposed Adverse Action (NPAA) Plaintiff issued on October 7, 2019, to a subordinate employee in order to redress the inappropriate hiring of the unqualified

individual for employment in the Asian Division, which was regarded by Human Capital Directorate ("HCD") officials as an illegal action.

64. Mr. Flanagan knew that WeChat was a China social media censored by the Chinese government.

65. However, even though Plaintiff told Mr. Flanagan several times he had stopped using WeChat after Congressional members had raised concerns about Chinese social media including WeChat, on December 5, 2019, Mr. Flanagan deliberately used an unapproved WeChat message out of context in order to support his challenge to Plaintiff regarding a notice of proposed adverse action (NPAA) issued by Plaintiff.

66. In addition, Mr. Flanagan violated the regulation prohibiting the use of staff's private text messages without a court order in an adverse action case investigation. Since "WeChat" is not considered to be a "safe" social media to employ in the context of the Library of Congress and its operations, and this case involves staff privacy, Mr. Flanagan should not have used this piece of text messaging for the ongoing investigation.

67. In fabricating this issue to impugn Plaintiff's integrity Mr. Flanagan once again engaged in discrimination against Plaintiff because of his race (Asian) and national origin (China), implying without any evidence that he continued to use the Chinese government-controlled social media, regardless of the fact that Plaintiff strongly opposed WeChat's censorship.

68. Several months beyond the time period to act with respect to the proposed adverse action Plaintiff had issued Mr. Flanagan continued to fail and refuse to support Plaintiff's proposed adverse action with regard to that individual but instead on July 24, 2020, he sought the elimination of the credentialing criterion which the subject employee had

attempted to elide, actions which served to leave that unqualified and deceptive individual in the employ of the Library in violation of the Library's regulations and subject to Plaintiff's now seriously undermined supervision.

69.  Mr. Flanagan's actions to unreasonably delay and then reject Plaintiff's proposed adverse action was recognized by the Asian Division staff and that individual, in particular, as intended to ridicule Plaintiff's adherence to the applicable Library rules and to embarrass Plaintiff with the imposition of this unprofessional outcome.

70.  Mr. Flanagan's discriminatory, hostile, and harassing treatment was based on Plaintiff's race (Asian) and national origin (China).

71.  For the reasons set forth in this Complaint, Defendant's actions violated Title VII of the Civil Rights Act of 1964.

72.  Defendant's actions were motivated by malice and reckless disregard for Plaintiff's rights under law.

73.  As a result of Defendant's actions, Plaintiff has suffered, and will continue to suffer, economic and non-economic damages, emotional distress, and other compensable damages.

**EUGENE FLANAGAN MANIFESTED HIS DISCRIMINATORY ANIMUS WHEN HE IGNORED PLAINTIFF'S CHOICE OF EMPLOYEE TO BE GRANTED PRESTIGIOUS INTERVIEW WITH ASSOCIATE LIBRARIAN IN ORDER TO RIDICULE, REBUKE, AND EMBARRASS PLAINTIFF**

74. Another Library employee who was directly slighted in favor of a White colleague is Tien Doan, an Asian American, who serves as Special Assistant to Plaintiff, the Asian Division Chief, and the Automation Office Coordinator.

75. Mr. Doan is Vietnamese American and has worked for the Library for more than 17 years.

76. On December 4, 2019, Mr. Flanagan told Plaintiff that he periodically recommended staff to meet with Associate Librarian (AL) Robin Dale. These were to be one-on-one meetings with the Associate Librarian.

77. Arranging these meetings is not a typical responsibility of the Director of GICD and had not been offered prior to Mr. Flanagan's unorthodox appointment to that post.

78. These one-on-one meetings are unique and widely regarded as prestigious opportunities for library employees to meet with a Library senior manager.

79. In the past several years Asian Americans have been under-represented in the meetings with the Associate Librarian that were arranged by Mr. Flanagan.

80. Plaintiff recommended Mr. Doan as a candidate to Mr. Flanagan because of his consistent high-level performance (his performance rating in 2019 was "Outstanding", in 2018 "Commendable"), and his length of service at the Library (17 years).

81. The Library currently, according to the 2019 annual report, has about 3,210 employees, of whom 57.4 percent are white, 29.1 percent are African American, 8.6 percent are Asian American, and 3.1 percent are Hispanic.

82. The Asian Division staff is 70 percent Asian (15 out of 21). Plaintiff demonstrated an awareness of the benefits of diversity by hiring four reference librarians who are non-Asians, because the Asian Division had only one (1) non-Asian employee when Plaintiff took the chief position.

83. Plaintiff regarded it as highly appropriate to provide this opportunity to Mr. Doan especially considering the Library's publicly stated assertion affirming the desirability of racial diversity in the Library's activities and because 70 percent of the Asian Division's

staff are Asians, and that Asian Americans have been underrepresented in such prestigious activities.

84. Despite Plaintiff's strong basis for his recommendation of Mr. Doan for this unique prestigious opportunity Mr. Flanagan chose another employee for this opportunity.

85. It came to Plaintiff's attention that discontent within the GICD has been accumulating since Mr. Flanagan became the director, especially among Asian, Hispanic, and African American employees, including among the individuals who are risking possible retaliation to be witnesses.

86. Since the historic *Cook* case, in 1984, the Library has confronted more than 50 cases in which Library employees  alleged unlawful job discrimination and retaliation, according to federal court records; cases which resulted in the Library paying  a considerable sum from taxpayers' money in damages to these and other victims of unlawful discrimination, harassment and retaliation.

87.  In his capacity as a manager at the Library, Plaintiff made persistent efforts to try to set a positive example and to be alert to and eliminate unlawful discrimination against Library employees and to also bolster minority representation in order to end a decades-long struggle with discrimination and expand diversity in the workforce.

88. It was in the context referenced in paragraphs 74 through 87 above that Mr. Flanagan's rejection of Plaintiff's recommendation of Mr. Doan as a particularly appropriate staff member to meet with the Associate Librarian struck Plaintiff and other Library employees as an intentional slight and disparagement of Plaintiff done in a manner to undermine Plaintiff's authority and status as Chief of the Asian Division.

89. That Mr. Flanagan did so without providing any specific reasons or requesting an alternate candidate from Plaintiff reinforced the perception that Mr. Flanagan's action manifested anti-Asian animus towards Plaintiff.

90. Instead of communicating with Plaintiff regarding his decision to reject Mr. Doan, Mr. Flanagan, without discussing it with either Plaintiff or Qi Qiu, directly reached out to recommend that another employee, Jonathan Loar, a South Asian reference librarian, who was supervised by Qi Qiu, have the opportunity to meet with the Associate Librarian.

91. Mr. Loar is a White male whose performance rating was lower than Tien Doan's in 2019 performance appraisal and has worked for the Library for much less time than Mr. Doan, only three years.

92. In this way Mr. Flanagan intentionally slighted and disrespected the contributions of Plaintiff and other Asian Americans employed by the Library; an act that contributed to the ongoing hostile work environment at the Library.

93. The harassment and hostile work environment Mr. Flanagan created altered the terms and conditions of Plaintiff's employment at the Library.

94. The harassment was offensive and unwelcome and occurred because Plaintiff is an Asian and was born in China.

95. Mr. Flanagan knew, or should have known, that his various actions and certain failures to act created and maintained a hostile work environment but he and the Library failed to take any steps to prevent the continued  harassment and failed to take prompt remedial action.

96. Plaintiff perceived the work environment as hostile and harassing and a reasonable person in his position would view the work environment as hostile and harassing.

97. Mr. Flanagan demonstrated his aggressive animus towards Asian Americans which had created and maintained the ongoing hostile work environment that Plaintiff and other Library employees experience in another incident involving Mr. Doan.

98. Another incident contributing to the maintenance of the hostile work environment based on invidious discrimination against employees based on their race (Asian) and national origin (Vietnam) occurred during a WebEx teleconference meeting on April 1, 2020, which three Asian Americans---Mr. Doan, Ms. Qi Qiu, and Plaintiff, plus Mr. Flanagan attended.

99. When Mr. Doan, who as Plaintiff's special assistant has been in charge of the Asian Division website migration project since December 17, 2019, suggested some website migration questions during the meeting, to which Mr. Flanagan in front of the three Asian Americans retorted, "Whatever you are doing, you need to make me happy."

100.      Upon information and belief, Mr. Flanagan's interjection of himself in that situation was perceived as inappropriate, hostile and disrespectful and it affected Mr. Doan adversely. Two Asian Americans Qi Qiu and Plaintiff who were present, were offended and shocked by Mr. Flanagan's interjection.

101.      Upon information and belief Mr. Flanagan has far less experience in Website works than Mr. Doan, who has more than 17 years' experience as Webmaster of the Asian Division since June 2003 and before that he was the lead software developer, leading a team of Java developers for the engineering department at University of Maryland and was the lead software developer for GM's fuel cell program. He has a Master of Science degree in electronic engineering from the University of Pennsylvania.

**Plaintiff's Intentional Exclusion from a Library Search Panel Manifested Mr. Flanagan's Discriminatory Animus towards Plaintiff**

102.    Between November 11 and December 12, 2019, USA JOBS posted a job posting for a new African and Middle Eastern Division (AMED) chief.

103.    As this is a Senior Level position, per Library regulation, all search panel members should be staff at the SL or above.

104.    Plaintiff was unfairly and discriminatorily excluded from this search panel, for which Mr. Flanagan served as the selecting officer for panel members.

105.    Within the GICD, the Asian Division and the AMED are two of the four international divisions and both cover Asian countries and have a majority of Asian American staff and are the only two international divisions with Senior Level Chiefs.

106.    The Asian Division and the AMED in particular, are very involved with collection development and management, as well as reference services. These two divisions are also the only divisions in GICD with custodial responsibilities. Due to these parallels, Plaintiff has served as Acting Chief of the AMED several times.

107.    Despite his familiarity with the AMED and experience in maintaining and developing the largest international collection in the Library of Congress, Plaintiff was not allowed to serve on the AMED chief search panel, despite his obvious superior qualifications and experience in both divisions.

108.    In Plaintiff's experience as a Library employee there are usually three members involved in any search panel, and they should have relevant experience to rely on within that search panel.

109.     Nevertheless, Plaintiff learned that the search panel members lacked suitable knowledge, expertise, and familiarity with international collections to serve on the Library search panel for a new Chief of the AMED Division.

110.     Kimberly Bugg, Chief (Senior Level Executive) of Research and Reference Services Division, told Plaintiff she was serving on the search panel.  On January 4, 2020, Ms. Bugg resigned from the Library of Congress. Since Ms. Bugg was serving on the search panel, her resignation created a need for a new panel member to replace her since the panel had not yet completed its assigned task.

111.     Once again, Plaintiff was denied the opportunity to participate in the search panel, despite being an expert on Asian Studies and the only remaining SL chief in GICD.

112.     In contrast, when in past years the Acquisitions and Bibliographic Access Directorate (ABA) had searched for a new chief and director for the Overseas Field Office, ABA Director Beacher Wiggins invited Plaintiff to join in the search panel several times, as both positions were related to international collections.

113.     Plaintiff also served on the search panels for the Director for the Islamberg Field Office in 2017, and the Chief of Asian and Middle Eastern Division (ASME) in 2019.

114.     On March 30, 2020, the chiefs of the international collection divisions,  Grant Harris, Suzanne Schadl and Plaintiff were informed by Mr. Flanagan that he had scheduled Skype "meet and greets" for the finalists for the AMED Chief position.

115.     Mr. Flanagan said, "I'd appreciate your participation and input in the final selection."

116.     The proposed dates were April 6th, 7th, and 8th. However, on April 6, 2020, when Plaintiff checked with Tyanne Rodger, Mr. Flanagan's administrative officer, on

how to attend the Skype meeting, he was told that "the meetings have been scheduled and are in progress via Skype."

117.     Subsequently, on April 7, 2020, Mr. Flanagan wrote to Mr. Harris and Plaintiff that "You do not need to be concerned about these now, … the meetings were being scheduled with the finalists last week so we proceeded with what we had."

118.     This action by Mr. Flanagan was troubling since it reflected the fact that he had acted irregularly with respect to this important search process. Specifically, during this whole process, he did not reveal who the finalists were, including whether or not any of them were internal candidates. Mr. Flanagan only distributed CVs of the finalists to Ms. Schadl, and deliberately chose not to send these to Plaintiff who was totally excluded from any information about the "meet and greet" opportunity with the finalists.

119.     It struck Plaintiff that Mr. Flanagan had deliberately excluded him from meeting with the finalists and given the absence of any reasonable basis for undermining the selection process in that way, it seemed to Plaintiff to be affected by the same discriminatory animus Mr. Flanagan had displayed towards him since he was named Director.

120.     Consequently, the whole process led by Mr. Flanagan with regard to the Library's search process for the new AMED Chief left Plaintiff with a sense that he was manipulating the situation and purposefully excluding Plaintiff from participating in any way within that selection process for an unlawful reason-animus towards Plaintiff because he is an Asian American and was born in China.

121.     Since then, Mr. Flanagan has continued to exclude Plaintiff from serving on either of two more recent search panels: one for a Senior Level chief of the Researcher and

Reference Services Division (RRS) (job posting on March 24 through April 24, 2020) and another for chief of Serial and Government Documents Division (SGD) (job posting on April 6 through May 6, 2020) in GICD.

122.     Moreover, the search panel for the SGD chief position consisted entirely of White chiefs including Mr. Flanagan who served as selecting officer.

123.     Through his above-described actions Mr. Flanagan intentionally slighted and disrespected the contributions of Plaintiff and other Asian Americans employed by the Library; an act that contributed to the ongoing hostile work environment at the Library.

**Plaintiff is the Only Chief Directed by Mr. Flanagan to Perform Atypical Duties**

124.     Plaintiff was assigned by Mr. Flanagan to conduct outreach duty for a November 14, 2018 visit by the ambassador of Bangladesh.

125.     Outreach duty is routinely handled by the Visitor Engagement Office and the Asian Division's role is to receive visitors in the Asian Reading Room and to introduce our collections and services.

126.     After the event, Mr. Flanagan severely criticized Plaintiff's coordination of this event, even though the ambassador as well as internal staff involved with the event were all very satisfied with the reception of the ambassador's visit, and the event was executed on par with standards of events executed by non-Asian Division Chiefs.

127.     Mr. Flanagan abruptly changed typical Library protocol and procedure for handling this specific instance of outreach duty, even though the chief of Visitor Engagement Office, which typically handles these events, agreed to execute the event.

128.     Mr. Flanagan has not directed any of the other division chiefs who are non-Asian to perform the same outreach duty which is atypical of a chief's usual responsibilities.

129.     Mr. Flanagan never expressed this type of criticism against non-Asian Division Chiefs about receiving foreign visitors.

130.     It appears Mr. Flanagan particularly targeted Plaintiff, the Asian Division Chief, even though the Chief of Visitor Engagements Office, Ms. Giulia Adelfio, agreed to greet the ambassador, which was part of her routine job.

131.     Furthermore, Mr. Flanagan himself originally agreed to come to the event, but did not show up.

132.     Plaintiff believes it is significant that Mr. Flanagan said nothing about his own absence but also chose to mischaracterize a successful visit to the Asian Reading Room as a poorly organized event for which he assigned unwarranted blame to Plaintiff.

133.     Mr. Flanagan's entirely unwarranted disparagement clearly shows his prejudice against the Plaintiff, the Asian Division and Asian Americans.

134.     Upon information and belief, current Asian Division personnel all feel unwarranted displeasure from Mr. Flanagan even though they work just as hard, if not harder, than their non-Asian colleagues and their accomplishments often exceed those of their non-Asian colleagues.

135.     Mr. Flanagan has shown he is unable to be fair to Plaintiff and other people of color.

136.     Another example of aggression Mr. Flanagan directed specifically against Plaintiff and not against other non-Asian chiefs occurred on August 30, 2019, when Mr. Flanagan directed Plaintiff to "organize all FYIs in common categories."

137.     During the past seven years that Plaintiff has served as Chief of the Asian

Division, this way of organizing FYIs had never been requested, nor is it the typical

protocol for organizing these matters.

138.     Additionally, this direction was not sent to any of other chiefs who are non-Asian.

To re-organize all Plaintiff's activity and FYIs per Mr. Flanagan's direction is a very

time-consuming and unnecessary task and a very unfair assignment, as confirmed by

Grant Harris, Chief of European Division, who told Plaintiff that he had never received

such a request from Mr. Flanagan.

139.     Grant Harris also pointed out: "I think it's almost redundant to say that they be

organized under common categories. Any FYI emails concerning, for example, item-

level barcoding could be all discussed under one agenda item of barcoding, or item-level

barcoding."

140.     On a regular and persistent basis since Mr. Flanagan was named GICD Director

and became Plaintiff's supervisor, Plaintiff experiences numerous crude

microaggressions from Mr. Flanagan with frequent verbal, nonverbal, and environmental

slights, snubs, or insults, most of which appear to be intentional.

141.     One of the examples of Mr. Flanagan's microaggressions against Plaintiff was

related to the Manchu rare materials cataloging project, which was successfully

completed in August of 2020.

142.     Mr. Flanagan groundlessly denigrated this project and alleged, falsely, that

Plaintiff had intentionally delayed it and unfairly characterized the unique and

challenging project that Plaintiff and the Asian Division had successfully carried out to

be "a project in a mess".

143.     Plaintiff had taken additional responsibility for cataloging material that had been in the collection for decades but has up until the present had not been cataloged.

144.     This project was significant for the Library's mission since until the material in the collection had been cataloged and online, it was not accessible to the vast majority of Library users.

145.     The Asian Division had never been tasked with any cataloging responsibility, so cataloging anything is work above and beyond the normal mission of the division. To have undertaken, and accomplished anything at all in this area, was widely recognized as worthy of praise, not the unwarranted criticism asserted by Mr. Flanagan.

146.     Mr. Flanagan's unwarranted criticism of Plaintiff regarding the Asian Division's Manchu rare book cataloging project was done because of Plaintiff's race (Asian) and national origin (China).

**Mr. Flanagan Directs Hostile, Caustic and Offensive Communications at Plaintiff in Person and in the Presence of Others on a Regular Basis**

147.     Mr. Flanagan communicates hostile, derogatory, or negative messages towards Plaintiff and seeks to dominate and silence Plaintiff rather than work with him; this occurs because of Plaintiff's race (Asian) and national origin (China).

148.     Additionally, Mr. Flanagan deliberately and regularly fails and refuses to timely respond to many of Plaintiff's work reports and requests, making it very hard to work with him in conducting Library business.

149.     The harassment and hostile work environment created by Mr. Flanagan became pervasive and altered the terms and conditions of Plaintiff's employment at the Library.

150.     The harassment was offensive and unwelcome and occurred because Plaintiff is
Asian and was born in China.

151.     Mr. Flanagan knew, or should have known, that his various actions and certain
failures to act created and maintained a hostile work environment but he and the Library
failed to take any steps to prevent the continued  harassment and failed to take prompt
remedial action.

152.     Plaintiff perceived the work environment as hostile and harassing and a
reasonable person in his position would have viewed the work environment as hostile,
harassing and unlawfully discriminatory.

### III.     PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court enter judgment in his favor
and against Defendant, and award the following relief:

a.  Declaratory relief, including but not limited to a declaration that Defendant's
    discriminatory conduct of the types of which Plaintiff complains herein violate
    Title VII of the Civil Rights Act of 1964;

b.  Injunctive relief, including but not limited to an order restraining Defendant from
    engaging in any further discriminatory conduct of the types of which Plaintiff
    complains herein;

c.  Remove Mr. Flanagan permanently from his position with the Library, or at a
    minimum, as Director of GICD;

d.  Raise Plaintiff's performance rating for 2019 to "Outstanding" with the
    commensurate salary and award;

e.  Compensatory damages in an amount to be determined;

f.   Attorneys' fees and costs;

g.   Any additional relief as justice allows.

## JURY DEMAND

Plaintiff demands a jury trial.

Respectfully submitted,

/s/ Jonathan G. Axelrod

/s/ H. David Kelly, Jr.

/s/ Justin P. Keating

_____

Jonathan G. Axelrod, Esq. (D.C. Bar No. 210245)
H. David Kelly, Jr. Esq. (D.C. Bar No.  472154)
Justin P. Keating, Esq. (D. C. Bar No.  475602 )
Beins, Axelrod, P.C.
1717 K Street, NW, Suite 1120
Washington, DC 20006
(202) 328-7222
Fax (202) 328-7030
jaxelrod@beinsaxelrod.com
dkelly@beinsaxelrod.com
jkeating@beinsaxelrod.com